## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
===============================
                              :
AUCTUS FUND, LLC,             :
                              :
        Plaintiff,            :
                              :
        v.                    :     Civil Action No. _____
                              :
ORIGINCLEAR, INC.,            :
                              :
        Defendant.            :
                              :
===============================
```

## COMPLAINT AND DEMAND FOR JURY TRIAL

## I. INTRODUCTION

1.      The Plaintiff, Auctus Fund, LLC, (hereinafter "Auctus" or the "Fund"), respectfully submits its Complaint and Demand for Jury Trial (hereinafter the "Complaint") against the Defendant, Originclear, Inc. (hereinafter the "Company" or "OCLN"), in the above-captioned action.  The Plaintiff's allegations, as set out herein, are asserted for such damages arising from, and resulting from, the Defendant's violations of the following:

a)      Section 10(b) of the Securities Exchange Act of 1934, *as amended* (hereinafter the "Exchange Act"), 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5;

b)      Massachusetts Uniform Securities Act, M.G.L. c.110A, §§ 101, *et seq.*, *as amended* (hereinafter the "Uniform Securities Act");

c)      breach of contract;

d)      breach of implied covenant of good faith and fair dealing;

e)      unjust enrichment;

    f)       breaches of fiduciary duty;

    g)       fraud and deceit;

    h)       negligent misrepresentation; and/or

    i)       the Massachusetts Consumer Protection Act, M.G.L. c. 93A, §§ 2 and 11.

2.       The Plaintiff further alleges that, as a result and as caused by the Defendant's breaches, actions, omissions, policies, practices, and/or courses of conduct, Auctus has suffered irreparable harm, requiring injunctive relief and specific performance, harm to its business and reputation in the investment industry, damages from the Defendant's coercion, duress, and unfair and deceptive anti-competitive acts, causing lost revenue, lost profits and prospective business, together with its injuries and damages.

3.       The Plaintiff respectfully requests that its causes of action against the Defendant proceed to a trial by jury, that a judgment be entered on all Counts against the Defendant and that Auctus be awarded its general, compensatory and consequential damages and losses, costs, interest, plus multiple and/or punitive damages, attorneys' fees, and grant, order and enter temporary, preliminary and permanent injunctive and equitable relief, and grant, order and enter declaratory relief, and any such other relief as this Honorable Court deems just and appropriate.

## II. **PARTIES**

4.       The Plaintiff, Auctus Fund, LLC is a limited liability company, duly organized in the State of Delaware, with its principal place of business located at 545 Boylston Street, 2nd Floor, Boston, Massachusetts 02116.

5.       Upon information and belief, the Defendant, Originclear, Inc., is a corporation, duly organized in the State of Nevada, with a principal place of business located at 525 S. Hewitt St., Los Angeles, California 90013.

### III. JURISDICTION AND VENUE

6.      The Plaintiff asserts that this Honorable Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, and under the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a, *et seq.* (hereinafter the "Securities Act"), and under the Exchange Act, 15 U.S.C. §§ 78a, *et seq.*

7.      The Plaintiff contends that, pursuant to 28 U.S.C. § 1391(b), venue is proper in the District of Massachusetts in that, pursuant to the Transaction Documents (defined below), the Plaintiff Auctus and Defendant OCLN agreed that any and all disputes between and/or among them shall be brought, *inter alia*, in the state or federal courts in the Commonwealth of Massachusetts. Additionally, this Court is in such District where the Plaintiff Auctus is headquartered and has its principal place of business and is where the violative conduct described herein is alleged to have occurred.

8.      This Court has personal jurisdiction, generally and specifically, over the Defendant by express terms of the Agreement, and as arising from its extensive business contacts, generally over time and specifically, in its business dealings with Plaintiff Auctus within the Commonwealth of Massachusetts.

### IV. FACTUAL BACKGROUND

#### A.      The Auctus / OCLN Transactions Documents and Contracts

9.      On or about April 2, 2018, the Company executed, *inter alia*, a certain Securities Purchase Agreement (hereinafter the "First Auctus Purchase Agreement" or the "First Auctus SPA") and a certain Convertible Promissory Note (hereinafter the "First Auctus Note" and, with the First Auctus SPA and other documents, collectively hereinafter the "First Auctus Transaction Documents"), thereby entering into a contract with Plaintiff Auctus for its investment in OCLN.

*See* First Auctus Purchase Agreement, attached, restated and incorporated by reference herein as **Exhibit A**; Note, attached, restated and incorporated by reference herein as **Exhibit B**.

10.     On or about May 31, 2018, the Company executed, *inter alia*, a certain Securities Purchase Agreement (hereinafter the "Second Auctus Purchase Agreement" or the "Second Auctus SPA") and a certain Convertible Promissory Note (hereinafter the "Second Auctus Note" and, with the Second Auctus SPA and other documents, collectively hereinafter the "Second Auctus Transaction Documents" and with the First Auctus Transaction Documents, collectively hereinafter the "Auctus Transaction Documents"), thereby entering into a contract with Plaintiff Auctus for its investment in OCLN.  *See* Purchase Agreement, attached, restated and incorporated by reference herein as **Exhibit C**; Note, attached, restated and incorporated by reference herein as **Exhibit D.**

11.     Thus, in detrimental reliance upon the information, representations and statements from the Defendant, the Plaintiff invested hundreds of thousands of dollars in the Company, which has, and has had, a fiduciary duty and a duty of the utmost loyalty to the Plaintiff.  Unfortunately, to its detriment, the Plaintiff has learned that the Defendant had misrepresented and deceived the Fund regarding its business, operations and finances, perpetrated securities fraud in connection with the offer, purchase and sale of securities, in violation of, *inter alia*, Section 10(b) of the Securities Exchange Act of 1934, as amended, and Rule 10b-5, as promulgated thereunder.

**B.      Defendant's Misrepresentations and Omissions of Material Facts and Securities Fraud in Connection with Offer, Purchase and Sale of Securities**

12.     The Plaintiff asserts and alleges that the Defendant misrepresented, omitted and failed to provide material facts to Auctus in connection with its investments and in the offer, purchase and sale of securities, and especially with respect to the operations, business, finances and other matters of Defendant OCLN.

13.     As an example of the material misrepresentations, omissions and false information provided to the Plaintiff, on or about March 22, 2018, the Defendant published and disseminated certain statements, entitled "*OriginClear Delivers First Commercial Unit in China for Ammonia Removal*, which provided, in pertinent part, as follows:

> "LOS ANGELES, March 22, 2018 /PRNewswire/ -- OriginClear Inc. (OTC/QB: OCLN), a leading provider of water treatment solutions, today announced that the company has delivered and commissioned its first commercial system in China. The unit is now helping the manufacturing site meet required quality standards for wastewater. OriginClear's system effectively removes levels of ammonia which are both high and variable, from a continuous flow of wastewater generated by a chrome-plating process.
>
> The unit delivered is an Advanced Oxidation (AOx) system model AO30, with maximum processing capacity of 30 m3 (or 8,100 gallons) per day.
>
> Mr. Ye Feng, Senior Engineer at the client's solution provider, Zhejiang Renxin Huankeyuan Co., Ltd., stated, 'We are extremely happy with the performance of the AO30 unit and the support OriginClear provided during installation. The ammonia level in this effluent varies significantly, and we believe that OriginClear's AOx technology is the perfect answer to this highly challenging issue.'
>
> The AO30 unit has demonstrated its ability to degrade ammonia from levels varying between 50 and 200 ppm, to under 5 ppm (parts per million).
>
> Stephen Jan, Director of OriginClear Technologies Ltd., OriginClear's wholly-owned subsidiary and master licensee for China, directly oversaw the construction and commissioning on site. He added: 'We are very pleased with this first commercial delivery. We are now able to provide local references to our future partners and their clients.'"

Upon information and belief, the Defendant's statements were incomplete, misleading and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff.

14.     As a further example of the material misrepresentations, omissions and false information provided to the Plaintiff, on or about March 30, 2018, the Defendant published and disseminated certain statements, entitled "*Progressive Water Treatment Completes Fifth Drinking Water System for Overseas Missions*," which provided, in pertinent part, as follows:

"LOS ANGELES, March 30, 2018 /PRNewswire/ -- OriginClear Inc. (OTC/QB: OCLN), a leading provider of water treatment solutions, today announced that its wholly-owned subsidiary, Dallas-based Progressive Water Treatment Inc. (PWT), recently completed the construction and shipment of a 30 gallon per minute (gpm) drinking water treatment system in Baranquilla, Colombia for the religious mission of a US-based Church.

'We're delighted to work with international contractors installing drinking water systems at religious missions throughout the world,' said Marc Stevens, PWT's President. 'They have learned to rely on us for on-time delivery and ongoing technical support.'

In addition to the recent Colombia shipment, PWT has built and supplied a total of five drinking water treatment systems to local contractors for installation at Church missions in Peru, Argentina, San Salvador and the Philippines.

The systems have all been similar and typically consist of chlorine feed, softener, carbon filters, ultraviolet disinfection and sub-micron filtration. These components are designed to remove hardness and organics from the local aquifer and are based on an Church specification naming PWT as the only approved manufacturer.

'Progressive Water Treatment continues to fulfill our expectations. Seeing repeat customers like this network of international contractors reaffirms Progressive's culture of quality and service,' stated Bill Charneski, President of the OriginClear Group™. 'Marc Stevens and his team set the bar very high for companies we intend to acquire.'"

Upon information and belief, the Defendant's statements were incomplete, misleading and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff.

15.     As a further example of the material misrepresentations, omissions and false information provided to the Plaintiff, on or about April 18, 2018, the Defendant published and disseminated certain statements, entitled "*OriginClear's WaterChain Issues Call for Self-Reliant Water Projects in Puerto Rico,*" which provided, in pertinent part, as follows:

"LOS ANGELES, April 18, 2018 /PRNewswire/ -- OriginClear Inc. (OTC/QB: OCLN), a leading provider of water treatment solutions, today announced that WaterChain, its decentralized water funding initiative, issued an open call for modular, on-site water treatment projects, with an early focus on the hurricane-affected island of Puerto Rico.

WaterChain is creating a water ecosystem on the blockchain to automate the complex chain of transactions that take place daily throughout the trillion-dollar global water industry. (PRNewsfoto/OriginClear, Inc.)

Candidates can fill out a form for consideration of their projects at https://goo.gl/hVGhqn.

WaterChain plans to fund modular, on-site industrial, agricultural and commercial projects that local service providers will install and manage, for customers who are willing to make a long-term commitment to fair usage rates. Having made such a commitment, these customers would benefit from fully-serviced on-site water treatment and recycling systems, without requiring a capital expense on their part.

WaterChain is intended to be a funding mechanism for such decentralized water projects, with plans to implement blockchain elements to make these more efficient. WaterChain's focus is on developing profitable water projects for its investors.

Puerto Rico is seen as an early candidate for decentralized water treatment because last year's Hurricane Maria badly damaged the island's centralized water infrastructure.

'We have a vision for decentralized water funding, and we want to put some of the intended early funding into one or more actual projects on the island of Puerto Rico', said Riggs Eckelberry, CEO of OriginClear. 'These first projects will show our commitment to developing and deploying the next generation of water treatment technologies. Even without using blockchain technology, there is a huge need for immediate solutions in Puerto Rico, and we want to begin now, while we continue to develop WaterChain.'

Eckelberry outlined the WaterChain concept in February, with a presentation to the d10e Silicon Valley conference (video). In March, he visited the island of Puerto Rico and spoke on the need to address the deep problems there (video).

'While FEMA terminated food and water aid to Puerto Rico last week (news), I personally know of businesses, such as hotels, that must fix their water treatment systems if they want to reopen,' said WaterChain advisor Enrique Martinez. 'I intend to work personally with the WaterChain team to help develop small, manageable projects that demonstrate this breakthrough concept for modular, on-site water treatment.'

Martinez is already on the ground in Puerto Rico, having already begun to develop energy microgrid solutions to power challenges on the island (news). He sees this work as complementary to the new WaterChain initiative in Puerto Rico.

Eckelberry cautioned that WaterChain has only just begun raising the funding needed to develop the projects it selects in Puerto Rico. OriginClear does not yet

have material contracts or commitments for services in Puerto Rico, and has not begun to receive revenue from operations there. There is no guarantee that any company-funded water treatment project can be implemented in any region including Puerto Rico, or that the Company's efforts will result in significant business or funding for OriginClear or its WaterChain initiative.

Persons from the water industry interested in making WaterChain a reality should contact the company at www.waterchain.io. The company plans to develop the solution in close consultation with the industry, but cautions that there is no assurance this effort will succeed, or that it will successfully fund, and eventually develop, a cryptocurrency offering."

Upon information and belief, the Defendant's statements were incomplete, misleading and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff.

16.     As a further example of the material misrepresentations, omissions and false information provided to the Plaintiff, on or about May 9, 2018, the Defendant published and disseminated certain statements, entitled "*AlgEternal Ramps Up Algae Production With OriginClear Harvesting Technology*," which provided, in pertinent part, as follows:

"LA GRANGE, Texas and LOS ANGELES, May 9, 2018 /PRNewswire/ -- OriginClear Inc. (OTC/QB: OCLN) and AlgEternal Technologies, a vertically-integrated producer of non-fuel high value products from microalgae, recently announced a formal licensing partnership, capping five years of continuous operation of OriginClear's first-generation Smart Algae Harvester™ at AlgEternal's LaGrange, Texas headquarters.

Following exhaustive testing, AlgEternal first selected OriginClear's EWS technology in 2013. In 2015, AlgEternal found that by using OriginClear's technology to harvest pure algae, conventional fertilizer costs could be reduced by up to 40 percent. More recently, in February 2018, a Texas A&M team studied the effectiveness of Agtivate™ in rice production, showing that yields could be increased by 500 to 900 lbs per acre, while reducing standard nitrogen up to 75%, when using Agtivate.

These test results demonstrated that OriginClear's line of Smart Algae Harvesters is highly efficient, effectively controls bacteria in the algal paste product to facilitate a long shelf life, and, uniquely, ensures the algae cells are alive after harvesting.

'This harvester is critical to our production of soil conditioners and skin care products,' said David Ramjohn, CEO of AlgEternal Technologies. 'We still use

that first unit provided by OriginClear five years ago, which speaks volumes for its durability and efficiency. This licensing agreement allows AlgEternal to build units ourselves, reducing our capital costs, and increasing our processing and production capacity.'

AlgEternal deploys the Smart Algae Harvester in the production of its initial commercial products, Agtivate for soil enrichment and AlgAllure™ for natural skin care. The algae producer is completing an upgrade of its production facility in La Grange, and plans to reach a commercial production level equivalent to a 1,000-gallon daily harvest of high-value algae paste.

'The algae sector in which we began seems to be taking off after a long incubation,' said Jean-Louis 'JL' Kindler, President of OriginClear Technologies. 'We see this elevated interest as a clear indication that this market is beginning to mature and expand.'

While OriginClear has itself expanded into water treatment with its breakthrough patented technology, it has always maintained a presence in the field that produced this technology — algae biomass production. AlgEternal is one of the long-term users of OriginClear technology now ramping up OriginClear units.

More information is available on OriginClear's technology site. Algae biomass producers interested in the Smart Algae Harvester should contact OriginClear.

'The Smart Algae Harvester delivers a significant competitive advantage to AlgEternal in the fledgling algae biotechnology industry,' continued Ramjohn. 'Combining OriginClear's technology with AlgEternal's own patented Vertical Growth Modules™ for algae is as close to an algae production dream team as you can get.'

AlgEternal states that its target markets are soil amendment and organic skin care. Ramjohn continues: 'We believe that Agtivate is an effective solution for increasing food production and reducing soil damage, objectives necessitated by global megatrends including the desertification, and the forecasted increase of global population to 9.6 billion by 2050.'

Prominent trends in the market, according to AlgEternal, also include the healthy consumer's awareness and willingness to pay for non-toxic, natural cosmetics, that have beneficial effects. For example, AlgAllure contains a natural marine red algal extract said to be highly beneficial to human skin."

Upon information and belief, the Defendant's statements were incomplete, misleading and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff.

17.     As a further example of the material misrepresentations, omissions and false information provided to the Plaintiff, on or about May 15, 2018, the Defendant published and disseminated  certain statements, entitled "*OriginClear's Texas Unit Revenue Continues Solid Growth Over Previous Year,*" which provided, in pertinent part, as follows:

> "LOS ANGELES, May 15, 2018 /PRNewswire/ -- OriginClear Inc. (OTC/QB: OCLN), a leading provider of water treatment solutions, today issued preliminary guidance that revenue for the three months ended March 31, 2018 for its Dallas-based subsidiary, Progressive Water Treatment (PWT), increased by 87 percent to an estimated $1,238,000 vs $662,130 for the same period last year.

> With forecasted revenue for the second quarter on a continued growth trend, the company believes that PWT is positioned for a record year.

> 'We have had an extremely busy first quarter. We are now poised for even more growth and a strong 2018,' said Marc Stevens, President of the Progressive Water Treatment subsidiary.

> 'The earlier industry downturn created opportunities for us, in that we are recruiting real performers,' said Bill Charneski, President of OriginClear Group. 'PWT hired water industry veteran Ronnie Garcia, who brought specific projects in the food and beverage market and the oil markets. This type of internal acquisition is extremely promising and we will continue to look for such opportunities.'

> As previously announced, the company believes that the 2016 U.S. Presidential election created uncertainties as to funding for water treatment, regulatory burdens and the health of the economy. Prior to the election, PWT found that many customers were putting their water treatment projects on hold. Even after the post-election period, the outlook remained uncertain; and it was not until mid-2017 that orders picked up.  That trend of increased revenue continues in 2018."

Upon information and belief, the Defendant's statements were incomplete, misleading and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff.

18.     As a further example of the material misrepresentations, omissions and false information provided to the Plaintiff, on or about June 12, 2018, the Defendant published and disseminated  certain statements, entitled "*OriginClear Licenses Technology to Water*

*Technologies International, Inc. (WTII) for Southeast USA*," which provided, in pertinent part, as

follows:

> "LOS ANGELES, June 12, 2018 /PRNewswire/ -- OriginClear Inc. (OTC/QB: OCLN), a leading provider of water treatment solutions, recently entered into a licensing agreement with Water Technologies International, Inc. (OTC: WTII), of Port St. Lucie, FL, which commercializes the innovative SIMPOD portable waste water treatment plant, and has developed a line of atmospheric water generators.
>
> Jean-Louis 'JL' Kindler, President of OriginClear's Technology Division said, 'This agreement will give OriginClear a strategic presence in the Southeast. We also plan to connect Water Technology with our academic partner, Florida Atlantic University (FAU), for scientific testing and further innovation.'
>
> The licensing agreement gives Water Technologies access to OriginClear's patented electrochemical treatment process, Electro Water Separation with Advanced Oxidation™ (EWS:AOx™), and support to enter the oil and gas and other markets. Water Technologies also acquired an EWS demonstration and research unit.
>
> OriginClear also purchased approximately 9% of Water Technologies common stock, and lent additional funds, helping Water Technologies finalize its acquisition of West Palm Beach-based WaterZone, which has specialized, for over 30 years, in complete system design, installations and maintenance for commercial, industrial and residential customers through Florida.
>
> The Technical Assistance Program fee, another part of OriginClear's licensing agreement, was paid to OCLN in WTII preferred shares. The license also calls for standard royalty payments to OriginClear.
>
> 'We intend to integrate OriginClear's technology for clarifying very dirty, very oily water for oil and gas produced water and landfill runoff water,' said William Scott Tudor, CEO of Water Technologies International, Inc. 'We were also very grateful for OriginClear's timely support in completing our strategic acquisition of WaterZone.'"

Upon information and belief, the Defendant's statements were incomplete, misleading and/or

misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff.

19.     As a further example of the material misrepresentations, omissions and false

information provided to the Plaintiff, on or about June 28, 2018, the Defendant published and

disseminated certain statements, entitled "*OriginClear Hosted Water Industry and Cryptocurrency Thought Leaders*," which provided, in pertinent part, as follows:

> "LOS ANGELES, June 28, 2018 /PRNewswire/ -- OriginClear Inc. (OTC/QB: OCLN), a leading provider of water treatment solutions, announced today that as its incubation of WaterChain drew to a close, it invited water industry stakeholders and cryptocurrency experts to advise on its WaterChain™ business model, technology and consortium.
>
> WaterChain aims to help address the worldwide water infrastructure shortage by using blockchain and cryptocurrency to create a new, decentralized ecosystem of water producers.
>
> On Monday June 18, OriginClear™ CEO and WaterChain chairman Riggs Eckelberry hosted a roundtable event to gather expert input at OriginClear headquarters in the Los Angeles Cleantech Incubator's La Kretz campus. Speakers included Thomas Marchesello of United States Fund, C Rees Morgan II of Qubechain, Josh Lawler of Zuber Lawler & Del Duca, Doctor Joe Story of Ultimate Settlements, Timothy Wetzel of Water Beetle and "JL" Kindler of OriginClear Technologies.
>
> Led by WaterChain's chief advisor and designated CEO David Metzler, the discussion included economic, technology and regulatory considerations, and the planned WaterChain Consortium of water and crypto industry stakeholders.
>
> 'We are now actively getting industry feedback on the WaterChain model and consortium,' said Eckelberry.
>
> 'It was truly an honor to be in a room with that many smart people,' added Metzler. 'It is vital to us that WaterChain be a solid, viable solution and it was gratifying to have so many brilliant people with different skillsets willing to come together to solve such a massive and important problem.'"

Upon information and belief, the Defendant's statements were incomplete, misleading and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff. For example, upon information and belief, the Defendant never disclosed its alleged cryptocurrency business plans, finances and operations in its business dealings with the Plaintiff, and omitted material information when it had a duty to disclose the same to the Plaintiff.

20.   As a further example of the material misrepresentations, omissions and false information provided to the Plaintiff, on or about July 19, 2018, the Defendant published and disseminated certain statements, entitled "*OriginClear Launches Modular Water Treatment Division*," which provided, in pertinent part, as follows:

"LOS ANGELES, July 19, 2018 /PRNewswire/ -- OriginClear Inc. (OTC/QB: OCLN), a leading provider of water treatment solutions, today announced Modular Water Systems (www.modularwater.com), its new division that offers a unique product line of prefabricated water treatment systems. Daniel 'Dan' Early P.E. (Professional Engineer), heads the new division.

Modular Water designs and delivers prefabricated wastewater treatment products to customers and end-users that have to clean their own wastewater. It uses Structurally Reinforced Thermoplastic (SRTP) materials to focus on developing water and wastewater collection, conveyance, and treatment systems that have high performance and sustainability.

Typical customers include schools, small communities, institutional facilities, real estate developments, factories, and industrial parks.

'According to the United States EPA, it will take a quarter trillion dollars to restore America's decaying water infrastructure, and there's no budget for that,' said Riggs Eckelberry, OriginClear CEO. 'Water users are increasingly forced to treat their own wastewater on-site, at the point of use. This sets the stage for Modular Water.'

Riggs continued, 'When you build a new school or community center, you'll need a water treatment system. It must be rapidly deployed, compact, self-sufficient, highly durable and cost-effective. Dan's patented inventions respond to this mandate.'

Eckelberry and Early discussed the product launch in a sponsored appearance on MoneyTV:https://www.originclear.com/video/originclear-launches-prefabricated-systems-division

Dan Early has pioneered the use of heavy reinforced plastic materials to create modular 'water-systems-in-a-box.' Not only is reinforced thermoplastic faster and cheaper to build, but it can have three times the lifespan, or more, compared with concrete-and-steel construction. His inventions have led to the patented Wastewater System & Method which OriginClear has licensed exclusively for the world.

In the words of Dan Early, 'We believe our products set a de facto industry standard for performance and longevity. SRTP products are superior to typical concrete, steel and fiberglass construction for a myriad of reasons including durability,

weight, life expectancy, corrosion resistance, water tightness, and ease of installation and maintenance. SRTP based products are in my view the superior choice, with an estimated minimum useful service life of 100 years or longer. The civil infrastructure world needs product offerings that will double or triple the normal life cycle of conventional materials and result in substantial reductions in life cycle operational costs.'

The new Modular Water Systems division plans to largely subcontract its manufacturing to OriginClear's subsidiary, Progressive Water Treatment of McKinney, Texas, before developing its own, in-house facilities.

In a 2016 Water Online guest column, 'The Water Revolution: Moving To A Decentralized System', Riggs Eckelberry stated, 'Instead of rebuilding our current infrastructure, we can equip water users to treat their own water with small, modular water treatment systems that can be built and installed locally. The opportunity is clear: move to a decentralized structure.'"

Upon information and belief, the Defendant's statements were incomplete, misleading and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff.

21.     As a further example of the material misrepresentations, omissions and false information provided to the Plaintiff, on or about August 14, 2018, the Defendant published and disseminated certain statements, entitled "*First Sale for OriginClear's Modular Water Treatment Division*," which provided, in pertinent part, as follows:

"LOS ANGELES, Aug. 14, 2018 /PRNewswire/ -- OriginClear Inc. (OTC/QB: OCLN), a leading provider of water treatment solutions, today announced that on July 25, 2018, its Modular Water Systems division (www.modularwater.com), received its first order totaling about $60,000.

The order was for a brewery wastewater treatment plant that will use a heavy reinforced plastic system invented and patented by Daniel 'Dan' Early P.E. (Professional Engineer), President of OriginClear's Modular Water Systems unit.

'Dan brought in his first sale within 30 days as president of Modular Water Systems,' said Riggs Eckelberry, OriginClear CEO. 'These sales can take months of lead time, so that is an amazing performance.'

Recently, OriginClear hired Brian Pearce as Operations Manager, with the priority mandate of supporting the rollout of Modular Water Systems. Previously, Pearce served as Chief Operating Officer of Beyond Security, a security software

company. In addition to hiring Brian, OriginClear is beefing up its accounting and service staff, and investing in manufacturing software.

Modular Water Systems is domiciled at OriginClear's wholly-owned subsidiary, Progressive Water Treatment of McKinney, Texas, and will rely on Progressive's manufacturing facilities until it develops its own in-house facilities.

The heads of these units will discuss these and other plans at OriginClear's First Water Conference, to be held on August 16th in the La Kretz Innovation Center.

'We plan to have candid and proactive discussions about our expansion plans,' said Bill Charneski, president of the OriginClear Group. 'Ultimately, we want to move to a standardized Modular Water Systems product line, and Progressive Water Treatment's capabilities are key to this plan.'

Modular Water™ designs and delivers prefabricated wastewater treatment products to customers and end-users that have to clean their own wastewater. It uses Structurally Reinforced Thermoplastic (SRTP) materials to focus on developing water and wastewater collection, conveyance, and treatment systems that have high performance and sustainability.

Typical customers include schools, small communities, institutional facilities, real estate developments, factories, and industrial parks.

Dan Early has pioneered the use of heavy reinforced plastic materials to create modular 'water-systems-in-a-box'. Not only is reinforced thermoplastic faster and cheaper to build, but it has at least three times the lifespan as compared with concrete-and-steel construction. His inventions have led to the patented Wastewater System & Method for which OriginClear holds world exclusive rights.

In a 2016 Water Online guest column, 'The Water Revolution: Moving To A Decentralized System,' Riggs Eckelberry stated: 'Instead of rebuilding our current infrastructure, we can equip water users to treat their own water with small, modular water treatment systems that can be built and installed locally. The opportunity is clear: move to a decentralized structure.'

Upon information and belief, the Defendant's statements were incomplete, misleading and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff.

22.     As a further example of the material misrepresentations, omissions and false information provided to the Plaintiff, on or about August 30, 2018, the Defendant published and

disseminated certain statements, entitled "*OriginClear's Texas Unit Doubles Its Revenues In First Half of 2018*," which provided, in pertinent part, as follows:

> "OriginClear Inc. (OTC/QB: OCLN), a leading provider of water treatment solutions, reported today that revenue at the half-year mark doubled year over year for its Dallas-based subsidiary, Progressive Water Treatment (PWT), while the division's gross profits quadrupled, helping the company in its drive toward overall profitability.
>
> Further expanding on its quarterly report, the company reported that PWT's revenue as of June 30, 2018 increased by 110% to $2,445,646 compared to $1,162,155 for the six months ended June 30, 2017. And the unit's gross profit increased by 417% to $437,074 compared to $84,560 for the same period.
>
> "I am very happy with the standout performance by Marc Stevens and his team in McKinney, Texas," said Riggs Eckelberry, CEO of OriginClear.
>
> "When we set up Dan Early with his book of business, we were able to rely on PWT's existing high quality fabrication capabilities," said Bill Charneski, President of the OriginClear Group. "We intend to continue to build the synergy between these organizations."
>
> Overall, OriginClear's operating losses for the same period narrowed by 31% from $2,646,019 to $1,816,886."

Upon information and belief, the Defendant's statements were incomplete, misleading and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff.

23.     As a further example of the material misrepresentations, omissions and false information provided to the Plaintiff, on or about September 12, 2018, the Defendant published and disseminated certain statements, entitled "*OriginClear Launches Next-Generation Advanced Oxidation Process*," which provided, in pertinent part, as follows:

> "OriginClear, Inc. (OTC/QB: OCLN), a leading provider of water treatment solutions, announced today that the company has completed development and testing of AOxPlus™, a patent-pending method to produce hydroxyl radicals in large quantities to treat highly contaminated wastewater.
>
> The highly reactive hydroxyl radical delivers more than twice the oxidation, or cleansing power, of chlorine, without the toxic byproducts. Based on laboratory testing, OriginClear engineers estimate that the new AOxPlus can produce 10,000

times more hydroxyl radicals than the original AOx technology, delivering superior contaminant breakdown on the same footprint.

To generate these new levels of hydroxyl, the OriginClear research team used a special air-breathing membrane in a new reactor, disintegrating hard-to-remove contaminants. AOxPlus does not require chemical injection, or clear water (as with Ultra-Violet or UV), and is cost-effective when compared with, for example, diamond electrodes. It can offer a more efficient treatment solution to sectors that produce highly contaminated wastewater, such as the pharmaceutical and food industries.

In April, the national engineering firm Carollo Engineers conducted a review of the AOx module, and submitted a report, with a summary now available. The study quantified the AOx module's ability to generate chlorine-based oxidants efficiently. It also confirmed that AOx technology produces hydroxyl radicals that can treat highly contaminated waters such as landfill leachate or industrial effluents. AOxPlus further builds on this established capability.

'With this new module, AOxPlus, we can increase oxidation power without relying on the addition of strong chemicals or other additives,' said Jean-Louis 'JL' Kindler, president of OriginClear Technologies. 'This new technology is practical for use in industrial environments, and cost-effective to implement.'

OriginClear's Technologies team is currently manufacturing pre-commercial AOxPlus units in the Advanced Prototyping Center at the La Kretz Innovation Campus in Los Angeles. A first unit has been shipped to OriginClear's wholly owned subsidiary in China for scheduled demonstrations in Asia. A second unit is intended for Florida Atlantic University (FAU), with which OriginClear partnered in April 2017 to study OriginClear's technologies in landfill 'black water' or leachate treatment.

Dr. Dan Meeroff, associate chair and professor at FAU's Department of Civil, Environmental & Geomatics Engineering, said, 'In our current project with OriginClear, we have already measured good performance of the AOx module for ammonia and COD removal in landfill leachate. We are considering using a Fenton process to remove the remaining harder COD in that water, and are looking forward to receiving the AOxPlus prototype from OriginClear and using it as the final polishing stage.'

OriginClear filed a provisional patent with the United States Patent and Trademark Office (USPTO) on August 7, 2018, to protect the Intellectual Property related to the manufacturing methods and the process for using AOxPlus.

OriginClear's core technology is Electro Water Separation™ (EWS), which efficiently clarifies water by removing visible solids and oils. In 2016, the company developed and proved its proprietary Advanced oxidation process, AOx™, to

address dissolved contaminants. EWS and AOx can be used separately or in synergy."

Upon information and belief, the Defendant's statements were incomplete, misleading and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff.

24.     As a further example of the material misrepresentations, omissions and false information provided to the Plaintiff, on or about October 23, 2018, the Defendant published and disseminated certain statements, entitled "*OriginClear Expresses Satisfaction with Growth of New Modular Division*," which provided, in pertinent part, as follows:

> "OriginClear Inc. (OTC/QB: OCLN), a leading provider of water treatment solutions, reported today that the Board expressed satisfaction with the performance of its new operating division, Modular Water Systems (MWS) (www.modularwater.com). Launched in late June of 2018, the division has performed accurately to its forecasts.
>
> As previously reported, MWS received its first order, totaling about $60,000, within one month of launch. In September, initial payments were received on two systems, for an additional $190,000.
>
> Based on forecasts, the company believes that the Company will receive approximately $1 million in purchase orders from the MWS division for the three months ending 31 December 2018.
>
> The company's expectation is reinforced by the fact that MWS is 'Basis of Design' on 20 out of 21 current or projected contracts.
>
> 'Basis of Design means we are the final and preferred technical solution,' said Daniel M. Early, P.E., President of Modular Water Systems. 'This provides a high degree of confidence that we will be successful in executing a contract and delivering a product to our customers.'
>
> 'Dan Early came to us with a portfolio of patents and a list of prospective customers,' said Riggs Eckelberry, CEO of OriginClear. 'We established MWS around him, with a support staff, and design and fabrication support from our Dallas subsidiary, Progressive Water Treatment.
>
> 'We believe that MWS will continue to grow into the first quarter of 2019,' concluded Eckelberry.

> MWS purchase orders usually consist of a 50% deposit, with 50% due on shipment. Cost of Goods is in the range of 50%.
>
> OriginClear cautions that the foregoing forecast for the quarter in progress is for received purchase orders only, and that Revenue Recognition of such orders is not expected within this same period; accordingly there cannot be any assurance that the Company will realize such revenue from the bookings."

Upon information and belief, the Defendant's statements were incomplete, misleading and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff.

25.     As a further example of the material misrepresentations, omissions and false information provided to the Plaintiff, on or about November 6, 2018, the Defendant published and disseminated certain statements, entitled "*OriginClear Retains TCA Capital*," which provided, in pertinent part, as follows:

> "OriginClear Inc. (OTC/QB: OCLN), a leading provider of water treatment solutions, reported today that the Company has retained TCA Capital International Group ('TCA') for a range of services including identifying potential merger, acquisition, divestiture, consolidation or other combination opportunities and negotiating, structuring and advising in connection with potential M&A Transactions.
>
> 'We are delighted that OriginClear has retained us,' said Patrick Primavera, Managing Director of TCA. 'We plan to evaluate and work toward an accretive acquisition, and to work to horizontally expand the business through the acquisition of industry competitors.'
>
> 'We are impressed with the drive and commitment of the TCA investment banking team,' said Riggs Eckelberry, CEO of OriginClear. 'Water companies grow by acquisition.'
>
> The Company cautions that suitable acquisition candidates may not be identified and even if identified a definitive agreement may not be reached."

Upon information and belief, the Defendant's statements were incomplete, misleading and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff.

26.     In its Form 10-Q for the quarter ending on September 30, 2018 (hereinafter the "2018 Form 10-Q"), however, the Company stated that it "recently moved into the

commercialization phase of [its] business plan having previously been primarily involved in research, development and licensing activities." *See* Originclear Form 10-Q for the quarter ending September 30, 2018, attached, restated and incorporated by reference herein as **Exhibit E** at p. 44

27.     Upon information and belief, the Defendant also omitted, *inter alia*, material facts to the Plaintiff regarding its finances, including but not limited to the Company's acceptance of a loan for Two Hundred - Thirty – Five Thousand - Two Hundred – Forty - Three and 00/100 ($235,243.00) Dollars (U.S.) from the Company's CEO at or about the same time that the Plaintiff agreed to invest in the Company. *See* **Exhibit E** at p. 40.

28.     Upon information and belief, Defendant OCLN made misrepresentations regarding the supposed progress of the Company, prior to and in connection with the offer, purchase and sale of securities with the Plaintiff, and as it contemplating making an investment of hundreds of thousands of dollars in the Company.

29.     As a direct and proximate cause of the violations of the federal securities laws of the Defendant, Auctus has suffered irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment, and resulted in the unjust enrichment of the Defendant.

**C.     Defendant's Events of Default and Breaches of SPA's and Notes**

30.     Thereafter, the Company incurred and/or caused several Events of Default, as set forth in Article III, entitled "*Events of Default*," of the Auctus Notes.  These Events of Default included, *inter alia*, breaches of following provisions of the Auctus Transaction Documents: a) Section 1.4(h) (Failure to Deliver Common Stock); b) Section 2.8 (Non-Circumvention); c) Section 3.2 (Failure to Honor Conversion); d) Section 3.4 (Breach of Agreement and Covenants – Sections 2.8 of the note – Non-circumvention and 1.3 see above); e) Section 3.5 (Breach of

Representations and Warranties – Section 3(g) (SEC Documents; Financial Statements) of the Auctus SPA); and f) Section3.16 (Replacement of Transfer Agent).

31.     Thereafter, it is undisputed that the Company incurred and/or caused several Events of Default, as set forth in Article III, entitled "*Events of Default*," of the Auctus Notes. In addition, pursuant to Section 3.1, an Event of Default shall have occurred by the failure of the Company to pay the principal or interest when due on the Note, whether at maturity, upon acceleration, or otherwise. *See* Notes (**Exhibit B**) and (**Exhibit D**), § 3.1.  Events of Default, together with others, have occurred and continue to occur.

32.     As a result of such Events of Default and the continuation of the same without cure, on or about November 30, 2018, Plaintiff Auctus delivered its Notice of Default on the April 2, 2018 Note and as to the May 31, 2018 Note (collectively hereinafter the "Default Notice") to the Company. Since the delivery of the Notice of Default, the Company has failed to cure the same, which default continues to the present date.

33.     Upon the occurrence of an Event of Default under Section 3.1 of the Auctus Notes, the entire principal and accrued interest shall be due and owing hereunder. Furthermore, an Event of Default pursuant to Section 3 of such Note, the Company is required to pay, and shall pay, Plaintiff Auctus the "Default Sum" (as defined therein), due under the Auctus Notes. Thus, as of February 8, 2019, the Company owes Plaintiff Auctus, under the First Auctus SPA and the First Auctus Note, the Default Sum totaling One Million – Two Hundred – Ninety– Four Thousand – Five and 53/100 (**$1,294,005.53)** Dollars (U.S.). *See* Auctus Schedule as of February 8, 2019, attached, restated and incorporated by reference herein as **Exhibit 1**. Until paid, the Default Sum shall continue to accrue the default interest rate of Twenty-four and 00/100 (24.00%) percent per year, provided by the Notes.

## V. <u>VIOLATIONS OF LAW</u>

## <u>COUNT I - VIOLATIONS OF FEDERAL SECURITIES LAWS</u>

34.     The Plaintiff reasserts Paragraphs 1 through 33 of the Complaint, together with **<u>Exhibits</u>**, and restates and incorporates them herein by reference.

35.     The Defendant violated Section 12(2) of the Securities Act, 15 U.S.C §77l(2), in addition to Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, in that, as described herein, and in connection with the purchase, offer and sale of securities, they knowingly, recklessly and intentionally:

   a)      employed manipulative and deceptive devices and contrivances;

   b)      employed devices, schemes and artifices to defraud;

   c)      made untrue statements of material fact and omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and

   d)      engaged in acts, practices and a course of business which operated as a fraud or deceit upon the Plaintiff.

36.     As a direct and proximate cause of the violations of the federal securities laws by the Defendant, Auctus has suffered irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment, and resulted in the unjust enrichment of the Defendant.

## <u>COUNT II - VIOLATIONS OF MASSACHUSETTS STATE SECURITIES LAWS</u>

37.     The Plaintiff reasserts Paragraphs 1 through 36 of the Complaint, together with **<u>Exhibits</u>**, and restates and incorporates them herein by reference.

38.     The Defendant violated Massachusetts Uniform Securities Act, Massachusetts General Laws Chapter 110A, §§ 101, *et seq.*, *as amended*, in that, as described herein, it offered and sold securities by means of untrue statements of material fact.

39.     The Defendant recklessly and intentionally omitted disclosure of pertinent material facts in an attempt to make its previous statements appear to not be misleading.

40.     As a direct and proximate cause of the violations of the Massachusetts state securities laws by the Defendant, Auctus has suffered irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment, and resulted in the unjust enrichment of the Defendant.

## COUNT III – BREACH OF CONTRACT

41.     The Plaintiff reasserts Paragraphs 1 through 40 of the Complaint, together with **Exhibits**, and restates and incorporates them herein by reference.

42.     Pursuant to the Security Purchase Agreements and the Notes, the Fund invested in the Company and sought to become a shareholder, in good faith, to join the Company in the accomplishment of its business goals and in accordance with the standards of the business and the securities industry.  The Fund contends that the Defendant breached the contract with the Plaintiff by its conduct, as described herein.

43.     The Fund alleges that the Company is liable for a breach of contract and for a breach of an implied covenant of good faith and fair dealing. A breach of contract is failure without excuse to perform a duty which is due under the contract. Additionally, the interpretation of a contract is a question of law, not fact. If the wording is not ambiguous, then the contract must be enforced according to its plain terms.

44.     The Plaintiff performed its obligations under the Purchase Agreements and the Notes, and in good faith.

45.     The Defendant, by its conduct described herein, violated the Purchase Agreements and the Notes, breaching its contract with the Plaintiff.

46.     As a direct and proximate cause of the Defendant's breaches of its contract, the Plaintiff has suffered irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment.

## COUNT IV – BREACHES OF IMPLIED
## COVENANT OF GOOD FAITH-FAIR DEALING

47.     The Plaintiff reasserts Paragraphs 1 through 46 of the Complaint, together with **Exhibits**, and restates and incorporates them herein by reference.

48.     It is well established in that every contract carries an implied covenant of good faith and fair dealing whereby the parties treat each other fairly and act in good faith and no party to the contract shall take any action to harm another party's rights under the contract. The duty imposed by this "implied covenant of good faith and fair dealing" pertains to bad faith in the performance of a contract, not just in its execution or negotiation. Implicit in every contract is the requirement on faithfulness to an agreed upon common purpose and consistency with the justified expectations of the other party.

49.     A breach of contract is the failure to perform for which legal excuse is lacking. As a matter of law, a contract existed, which the Company breached and failed to comply with the covenant of good faith and fair dealing. The law is clear - the Fund had binding contracts and the Company has no legal basis, as a matter of law, to avoid its obligations under the Notes or the damages, including but not limited to damages set forth pursuant to Section 3.10 of such Notes which arose as a result from the breach of the Purchase Agreements and the Notes.

50.     The Defendant had a duty of good faith and fair dealing in its dealings with the Plaintiff and pursuant to the promises, contracts, and statements made to the Plaintiff to induce it to enter into the contracts and provide assets to the Defendant in exchange for its promise to repay the same, with interest.

51.     Under the covenant, the Defendant was obligated to a good faith performance of its obligations under the Purchase Agreements and the Notes with the Plaintiff, and to be faithful and consistent to the justified expectations of the Plaintiff.

52.     As described above, the Defendant breached the implied covenant of good faith and fair dealing with the Plaintiff.

53.     As a direct and proximate cause of the Defendant's breaches of the implied covenant of good faith and fair dealing, the Plaintiff has suffered irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment.

## COUNT V – UNJUST ENRICHMENT

54.     The Plaintiff reasserts Paragraphs 1 through 53 of the Complaint, together with the **Exhibits**, and restates and incorporates them herein by reference.

55.     The Defendant illegally received assets and benefits from the Plaintiff, as arising from its false and fraudulent statements and misrepresentations, and without providing equivalent value therefor.

56.     The Defendant's actions, courses of conduct, and omissions were wantonly, intentionally, and maliciously conducted against the Plaintiff, to its detriment.

57.     The Defendant has been unjustly enriched by its actions, as described herein.

58.     As a direct and proximate cause of the Defendant's unjust enrichment, the Plaintiff has suffered irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment.

## COUNT VI – BREACH OF FIDUCIARY DUTY

59.     The Plaintiff reasserts Paragraphs 1 through 58 of the Complaint, together with the **Exhibits**, and restates and incorporates them herein by reference.

60.     A fiduciary relationship existed between the Plaintiff and the Defendant, requiring it to act with a duty of the utmost loyalty and trust on behalf of the Plaintiff.  As a fiduciary, the Defendant was required to maintain and protect the welfare of the Plaintiff.

61.     By engaging in the conduct described herein, the Defendant breached its fiduciary duties to the Plaintiff.

62.     As a direct and proximate cause of the Defendant's breach of fiduciary duty, the Plaintiff has suffered irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment.

## COUNT VII – FRAUD AND DECEIT

63.     The Plaintiff reasserts Paragraphs 1 through 62 of the Complaint, together with the **Exhibits**, and restates and incorporates them herein by reference.

64.     The actions of the Defendant described herein constitute fraud and deceit, including but not limited to the following:

a)     the Defendant made false representations of material facts, and/or omitted material facts with a duty of disclosure, knowing or having reason to know of their falsity;

b)     the Defendant made said misrepresentations and omissions for the purpose

of inducing reliance from the Plaintiff; and

c)       the Plaintiff did rely upon said misrepresentations and omissions, to its

detriment.

65.       As a direct and proximate cause of the Defendant's fraud and deceit, the Plaintiff

has suffered irreparable harm, and general, special, and consequential damages, including, but not

limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment.

## COUNT VIII - NEGLIGENT MISREPRESENTATION

66.       The Plaintiff reasserts Paragraphs 1 through 65 of the Complaint, together with

**Exhibits**, and restates and incorporates them herein by reference.

67.       The conduct of the Defendant as described herein constitutes negligent

misrepresentation in that the Defendant negligently provided the Plaintiff with erroneous and

misleading information, and negligently omitted material information with a duty to disclose, to

the Plaintiff's detriment.

68.       As a direct and proximate cause of the Defendant's negligent misrepresentations,

the Plaintiff has suffered irreparable harm, and general, special, and consequential damages,

including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its

detriment.

## COUNT IX - VIOLATIONS OF MASSACHUSETTS
## CONSUMER PROTECTION ACT / M.G.L. C. 93A, §§ 2 & 11

69.       The Plaintiff reasserts Paragraphs 1 through 68 of the Complaint, together with the

**Exhibits**, and restates and incorporates them herein by reference.

70.       At all relevant times herein, the Defendant conducted a trade or business, as defined

by the Massachusetts Consumer Protection Act, M.G.L. c. 93A, within the Commonwealth of

Massachusetts.

71.     The conduct of the Defendant as described herein, constitutes unfair and deceptive trade practices, under Sections 2 and 11 of the Consumer Protection Act, including but not limited to claims that the Defendant:

a)      executed the Securities Purchase Agreements and the Notes with full knowledge and understanding of the Defendant's obligations to the Plaintiff;

b)      fraudulently induced the Plaintiff to invest in the Company and thereby breached its promise to repay the Plaintiff;

c)      fraudulently concealed from the Plaintiff the full and complete financial and operational details and prospects of the Company in inducing the Plaintiff to make its investment in the Company;

d)      knowingly and intentionally concealed these activities from the Plaintiff, to its detriment; and/or

e)      violated the requirements, terms and conditions of existing statutes, rules and regulations meant for the protection of the public's health, safety or welfare.

72.     As a direct and proximate cause of the Defendant's violations of the Massachusetts Consumer Protection Act, M.G.L. c. 93A, Sections 2 and 11, the Plaintiff has suffered irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment.

## VI. <u>REQUESTS FOR RELIEF</u>

WHEREFORE, the Plaintiff, Auctus Fund, LLC, respectfully request that this Honorable Court grant it the following relief:

A)       Order, grant and enter temporary, preliminary and permanent injunctive and equitable relief, and specific performance, and finding that the Plaintiff has suffered irreparable harm, has a likelihood of success on the merits, that the balance of hardships favors the Plaintiff and that it is in the public interest to grant such temporary, preliminary and permanent injunctive and equitable relief, and specific performance for the benefit of the Plaintiff, as set forth herein;

B)       Determine that the Defendant is liable for all damages, losses, and costs, as alleged herein;

C)       Determine and award the Plaintiff, Auctus Fund, LLC, the actual losses sustained by it as a result of the violations of law by the Defendant, as set forth herein;

D)       Render a judgment and decision on behalf of the Plaintiff, Auctus Fund, LLC, on all Counts of the Complaint, and issue findings of fact and rulings of law, as necessary and appropriate, that the Defendant is liable, in all respects;

E)       Order, decide, adjudge, and determine that the liability of the Defendant,  is for all losses, injuries, and damages, special, consequential, general, punitive, and/or otherwise, and for all interest and costs, as alleged herein;

F)       Award the Plaintiff, Auctus Fund, LLC, its costs, including, but not limited to, filing fees, costs, expenses and interest, for being required to prosecute this action;

G)       Award the Plaintiff, Auctus Fund, LLC, its actual attorneys' fees, for being required to prosecute this action;

H)      Award the Plaintiff, Auctus Fund, LLC, multiple, double, treble, and/or punitive damages in an amount to be determined;

I)      Enter judgment on behalf of the Plaintiff, Auctus Fund, LLC, on the Complaint;

J)      Order declaratory relief, as appropriate and as this Honorable Court deems necessary; and/or

K)      Any additional relief which this Honorable Court deems just and proper.

**THE PLAINTIFF, AUCTUS FUND, LLC,**
**<u>DEMANDS A TRIAL BY JURY ON ALL COUNTS SO TRIABLE</u>**

Respectfully Submitted,
PLAINTIFF, Auctus Fund LLC,

By its Attorneys,


    /s/  *Philip M. Giordano*
Philip M. Giordano, Esq. (BBO No. 193530)
Giordano & Company, P.C.
REED & GIORDANO, P.A.
47 Winter Street, Suite 800
Boston, Massachusetts 02108-4774
Telephone: (617) 723-7755
Facsimile: (617) 723-7756
Email: pgiordano@reedgiordano.com

Dated: February 12, 2019