**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| _____ | ) | |
| **AUCTUS FUND, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No.** |
| | ) | **19-10273-FDS** |
| **v.** | ) | |
| | ) | |
| **ORIGINCLEAR, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO SET ASIDE
SETTLEMENT AGREEMENT AND PLAINTIFF'S MOTION TO STRIKE**

SAYLOR, C.J.

This is a business dispute that has turned into a dispute concerning a settlement

agreement. Plaintiff Auctus Fund, LLC made an investment in defendant OriginClear Inc. in

2018, pursuant to which OriginClear executed two convertible notes. OriginClear then defaulted

on its obligations under the notes. Auctus filed suit, alleging various claims under state and

federal law.

After a brief round of litigation, the parties entered into a settlement agreement on March

13, 2019, that (purportedly) terminated the litigation. On March 14, 2019, pursuant to that

agreement, the Court entered a stipulated-to preliminary injunction that required OriginClear to

convert the notes held by Auctus into the common stock of OriginClear. Auctus was permitted

to sell or transfer the shares subject to certain daily maximums. However, OriginClear fulfilled

only some of Auctus's conversion requests before terminating its transfer agent and declining to

authorize the successor agent to fulfill additional requests.

Proceedings in this Court resumed on November 6, 2020, when OriginClear moved to vacate the preliminary injunction on the ground that the notes were void under federal securities law.  The Court denied that motion and granted Auctus's motion for a writ of attachment on the unpaid settlement amount.  The dispute, however, remained unresolved.

Four motions are now before the Court.  Auctus has moved for an amended attachment order and to compel the posting of a bond, and in the alternative for leave to conduct asset discovery, and for sanctions under Fed. R. Civ. P. 11 and 28 U.S.C. § 1927.  OriginClear has moved to set aside the settlement agreement as void under Section 29(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78cc(b).  Auctus has moved to strike that motion as duplicative of its earlier motion to vacate, and for further sanctions and attorney's fees.  Finally, Auctus has moved to clarify the Court's March 2019 preliminary injunction to allow OriginClear's successor transfer agent to resume processing conversion notices from Auctus without OriginClear's authorization.

This Order resolves OriginClear's motion to set aside the settlement agreement and Auctus's motion to strike the motion to set aside, and for further sanctions and attorney's fees. For the following reasons, both motions will be denied.

## I.    Background

### A.    The Parties

Auctus Fund, LLC is a Delaware limited liability company based in Boston, Massachusetts.  (Compl. ¶ 4).  Auctus is in the business of investing in small companies.

OriginClear, Inc. is a corporation organized in the state of Nevada with a principal place of business in Los Angeles, California.  (Compl. ¶ 5).  OriginClear is in the business of water-systems technology.

### B.    The Investment Transactions and OriginClear's Default

On April 2, 2018, Auctus executed a Securities Purchase Agreement ("SPA") with OriginClear.  (Compl. ¶ 9; Ex. A).  As part of the agreement, the parties executed a convertible promissory note in the principal amount of $150,000, subject to a yearly interest rate of 10% and repayable by April 2, 2019.  (Compl. Ex. B ("April Note")).  On May 31, 2018, the parties executed a second SPA and a second note for the same amount.  (Compl. ¶ 10, Ex. C, Ex. D ("May Note")).  The notes provided Auctus with the right to convert any part of the unpaid principal into newly issued shares of OriginClear stock at a 50% discount to the lowest trading price during the 25 trading days prior to conversion.  (April Note at ¶¶ 1.1-1.2; May Note at ¶¶ 1.1-1.2).  The notes also barred Auctus from holding more than 4.99% of OriginClear's outstanding shares at any given time.  (April Note at ¶ 1.1; May Note at ¶ 1.1).

On October 5, 2018, Auctus requested a series of conversions that reduced the overall debt owed under the April Note by $40,100 and introduced 29,400 new shares into the market, causing OriginClear's stock price to drop by 30%.  (Docket No. 36, Ex. 1 ("Riggs Decl.") ¶¶ 23-26).  OriginClear decided to terminate its transfer agent to prevent Auctus from converting more debt and further diluting the stock.  (*Id.* ¶ 28).

On November 30, 2018, Auctus delivered notice of default on the April and May notes.  (Compl. ¶ 32; Docket No. 5, Exs. H, I).  Auctus then filed suit on February 12, 2019, alleging various violations of federal and state securities laws and contract and tort claims.  The complaint alleged that OriginClear was required under the terms of the notes to pay an amount totaling $1,294,005.53, plus annual interest.  (Compl. ¶ 33).  On February 22, 2019, Auctus filed several emergency motions seeking a preliminary injunction, expedited attachment of assets, and specific performance of the debt conversion owed under the notes.  (Docket Nos. 5-8).

C.     __The Settlement Agreement__

On March 13, 2019, the parties executed a Settlement Agreement and jointly filed a

stipulated-to preliminary injunction as part of that settlement.  (Dkt. No. 14; Dkt. No. 36, Ex. 5

("Settlement Agreement")).

Under the Agreement, OriginClear was required "to irrevocably authorize and reserve a

sufficient amount of shares of the Company's common stock" to satisfy a minimum settlement

value of $570,000.  (Settlement Agreement ¶ 1.2(a)-(b)).  The settlement shares were to be

converted subject to the terms of the notes, including the 4.99% beneficial ownership restriction

and the 50% discount rate.  (*Id.* ¶ 1.2(b)).  OriginClear was required to deliver irrevocable letters

of instruction to its transfer agent authorizing the issuance and delivery of the company's shares

to Auctus upon receipt of a conversion notice.  (*Id.* ¶¶ 1.4(c), 1.6).

Auctus's required performance under the Agreement included the release of its claims, as

well as compliance with the following "leak-out" provisions:  for 180 days following the

execution of the Agreement, Auctus's daily sales of the converted stock were limited to the

greater of 25% of the average daily trading volume over the preceding 30 trading days, or

$10,000 in net daily transaction value.  (*Id.* ¶¶ 1.2(a)-(c)).  Finally, where the sale of the

settlement shares resulted in net proceeds less than the settlement value, Auctus was "entitled to

additional Settlement Shares" to make it whole.  (*Id.* ¶ 2.1).

The Settlement Agreement contained the following general release:

> OriginClear, Inc.  . . . hereby release[s] Auctus Fund, LLC . . . from any and all
> liability, actions, claims, damages, expenses or costs . . . related to or arising out
> of the Purchase Agreements, the Notes and/or business relationship between and
> among the Fund and the Company.  The Parties agree that this release of claims is
> intended to be a broadly construed "General Release" and includes any dispute,
> action or claim that is known or unknown to the [OriginClear] Releasors,
> including but not limited to . . . claims arising under . . . federal, state or local
> statute, law, or ordinance, concerning the terms and conditions of the Purchase

Agreements, the Notes and/or the business relationship, the performance under
the Purchase Agreements, the Notes and/or the business relationship; and any
claim arising under common law or by public policy, except claims or
proceedings necessary to enforce the provisions of this Agreement and claims that
cannot be waived as a matter of law.

(Settlement Agreement, Ex. C).[1]

Finally, the settlement's "governing law" provision stated that the "Agreement shall be

construed in accordance with the laws, including the law of conflicts, of the State of Nevada,

without reference to its conflicts/choice of law rules, and, where applicable, under federal law."

(Settlement Agreement ¶ 8.9).

On March 14, 2019, the Court terminated the emergency motions filed by Auctus and

issued the stipulated-to injunction.  On March 10, 2020, the Court stayed the case with the

Settlement Agreement to remain in place.

### D.     Events Leading to Pending Motions

On November 6, 2020, OriginClear filed a motion under Fed. R. Civ. P. Rule 60(b) to

vacate the preliminary injunction on the ground that the SPAs and notes were void.  At the same

time, it moved for a temporary restraining order and preliminary injunction to prevent Auctus

from enforcing the notes or further converting the debt into OriginClear common stock.

The Court denied the motion to vacate the preliminary injunction at a hearing on

December 3, 2020.  The Court based its decision on the fact that the Settlement Agreement and

general releases waived the right of OriginClear to challenge the validity of the notes and SPAs.

The Court noted that there was "no reason based on the record before [it] to set aside the

Settlement Agreement," absent "evidence of lack of consideration, fraud in the inducement or

anything else that would vitiate the formation of the contract."  (Dec. 3, 2020 H'rg Tr. at 18).

---

[1] The Agreement contains a parallel release of claims by Auctus.

The Court declined to rule on the merits of OriginClear's argument that Auctus had acted as an unregistered dealer.  (*Id.* at 19).

On December 17, 2020, the Court issued a writ of attachment in the amount of $338,119.04 and a trustee summons to Wells Fargo Bank, N.A.  It then denied OriginClear's emergency motion to certify the attachment order for interlocutory appeal, as well as a cross-motion by Auctus for sanctions.  On January 7, 2021, Wells Fargo filed an answer attesting that it held no funds in OriginClear's name.

Following a status conference on January 13, 2021, at which the parties were advised to confer on the posting of a bond to satisfy the attachment order, Auctus and OriginClear exchanged multiple draft stipulations in an attempt to reach a further settlement agreement. After these discussions proved unfruitful, Auctus filed a motion for an amended attachment order and to compel posting of a bond.  Auctus also renewed its motion for sanctions.

OriginClear has now moved to set aside the Settlement Agreement as void under Section 29(b) of the Exchange Act, 15 U.S.C. § 78cc(b).  Unlike the earlier motion to vacate—which argued that the notes underlying the Settlement Agreement were void—the current motion challenges the validity of the Settlement Agreement itself.  Auctus has moved to strike the motion as duplicative of OriginClear's earlier motion to vacate.

## II.    Analysis

### A.    Motion to Strike

Before considering the validity of the Settlement Agreement, the Court will first address plaintiff's motion to strike.

Plaintiff contends that the motion to set aside the Settlement Agreement is duplicative and unnecessary because the Court has "already considered and resolved the validity and enforceability of the Settlement Agreement" in denying defendant's motion to vacate the March

2019 preliminary injunction, and in granting plaintiff's motion for an attachment.  (Pl. Mem. at 3).  It also seeks sanctions pursuant to 28 U.S.C. § 1927 and Fed. R. Civ. P. 11, including a prohibition on further filings without the written assent of plaintiff or the Court, and attorney's fees.

The November 2020 motion to vacate asserted that plaintiff's failure to register as a dealer rendered the SPAs and notes void under Section 29(b) because plaintiff violated the dealer-registration requirement of the Exchange Act.  The Court denied that motion in part because any claim challenging the underlying notes was released by the Settlement Agreement, and there was no "evidence of lack of consideration, fraud in the inducement or anything else that would vitiate the formation of the [settlement] . . . ."  (Dec. 3, 2020 H'rg Tr. at 18). However, the Court explicitly "express[ed] no opinion whatsoever on the merits of the underlying dispute, that is, whether or not Auctus improperly failed to register as a dealer . . . ." (*Id.* at 19).  Defendant continued to raise the same challenge to the underlying notes at subsequent hearings, which the Court again declined to consider on the basis that the Settlement Agreement was still in effect.  (*See* Dec. 14, 2020 H'rg Tr. at 16-17; Dec. 21, 2020 Hr'g Tr. at 3-4).

While the underlying theory remains essentially the same, here defendant challenges the validity of the Settlement Agreement itself, an argument the Court has not yet addressed. Defendant's motion to set aside is therefore not entirely redundant.  Nor did the Court implicitly rule on the enforceability of the Settlement Agreement by granting the attachment order, as the validity of the Settlement Agreement was not before the Court at that time.

Accordingly, plaintiff's motion to strike and motion for sanctions and attorney's fees will be denied.

B.      **Motion to Set Aside**

1.      **State-Law Questions of Contract Formation**

Plaintiff first asserts that defendant has failed to identify a "Nevada statute or common law doctrine [that] would render the Settlement Agreement void."  (Opp'n at 8).  Defendant does not dispute for the purposes of this motion that the Settlement Agreement is governed by Nevada law.  (Settlement Agreement ¶ 8.9).  *See also May v. Anderson*, 121 Nev. 668, 672 (2005) ("Because a settlement agreement is a contract, its construction and enforcement are governed by principles of contract law.").  And defendant has not identified a basis for voiding the Settlement Agreement due to a defect in formation, undue influence, mistake, fraud, or other state-law grounds.

Nevertheless, federal law gives defendant an independent basis for seeking recission or for asserting a defense of invalidity, and "a federal court has a duty to determine whether a contract violates federal law before enforcing it."  *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 83-84 (1982).  "Where the enforcement of private agreements would be violative of [federal] policy, it is the obligation of courts to refrain from such exertions of judicial power."  *Hurd v. Hodge*, 334 U.S. 24, 35 (1948) (footnotes omitted).  And under Nevada law, "court[s] will not enforce contracts that violate public policy."  *Clark v. Columbia/HCA Info. Servs., Inc.*, 117 Nev. 468, 480 (2001); *see also Bart St. III v. ACC Enterprises, LLC*, 2018 WL 4682318, at *8 (D. Nev. Sept. 27, 2018) (declining to enforce portions of a promissory note that violated federal controlled-substance statute).

The principal question, therefore, is whether the Settlement Agreement is enforceable under federal law.

2.      **Federal-Law Questions of Voidness and Waiver**

8

Defendant seeks to set aside the Settlement Agreement as void under Section 29(b) of the Exchange Act on the ground it calls for an unregistered dealer to transact in securities in violation of Section 15(a), 15 U.S.C. § 78o.  Plaintiff opposes the motion on multiple grounds.  First, it contends that the general release contained within the Settlement Agreement bars defendant's claim.  Second, it contends that neither the Settlement Agreement nor the performance it requires involve a prohibited transaction by an unregistered dealer.  Third, even if a prohibited transaction is involved, plaintiff contends that defendant cannot seek rescission under Section 29(b) because it is not an unwilling, innocent party, and has unduly delayed in bringing its claim.

Because the Court finds that the release in the Settlement Agreement is valid under federal law, it will not reach the remaining issues.

### a.      <u>Recission under Section 29(b)</u>

The Exchange Act defines a dealer as "any person engaged in the business of buying and selling securities . . . for such person's own account through a broker or otherwise."  15 U.S.C. § 78c(a)(5)(A).  Dealers may be registered by filing the proper documentation with the Securities and Exchange Commission ("S.E.C.").  15 U.S.C. § 78o(b).  Section 15(a) states:

> It shall be unlawful for any broker or dealer . . . to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker or dealer is registered in accordance with subsection (b) of this section.

15 U.S.C. § 78o(a)(1).  The broker-dealer registration requirement "ensures that sellers of securities understand and appreciate both the nature of the securities they sell and their responsibilities to the investors."  *EdgePoint Cap. Holdings, LLC v. Apothecare Pharmacy, LLC*, 6 F.4th 50, 58 (1st Cir. 2021) (quoting *Roth v. S.E.C.*, 22 F.3d 1108, 1109 (D.C. Cir. 1994)) (internal alterations omitted).

A contract made in violation of the Exchange Act is voidable at the option of the non-violating party under Section 29(b).  *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 387-88 (1970); *Daley v. Capitol Bank & Tr. Co.*, 506 F.2d 1375, 1376 (1st Cir. 1974).  Section 29(b) provides:

> Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract . . . the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void [] as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract . . . .

15 U.S.C. § 78cc(b).  Courts have interpreted that provision as implying a private cause of action for rescission.  *See Regional Properties, Inc. v. Financial & Real Est. Consulting Co.*, 678 F.2d 552, 557 (5th Cir. 1982) ("[C]ourts have uniformly either held or assumed that such suits can be brought.").  Violations of the Exchange Act may also be raised defensively under Section 29(b) to avoid otherwise-valid contractual obligations.  *See, e.g.*, *Costello v. Grundon*, 651 F.3d 614, 627-29 (7th Cir. 2011) (borrowers could assert violations of margin regulations as an affirmative defense to the enforcement of promissory notes); *Cornhusker Energy Lexington, LLC v. Prospect St. Ventures*, 2006 WL 2620985, at *7 (D. Neb. Sept. 12, 2006) ("Section 29(b) can furnish an affirmative defense.").  This includes defending against the enforcement of a settlement agreement.  *See DeHuff v. Digital Ally, Inc.*, 2009 WL 4908581, at *2 (S.D. Miss. Dec. 11, 2009) (acknowledging that a settlement agreement "to compensate an unregistered broker for effecting securities transactions" would be voidable under Section 29(b)).

### b.      Anti-Waiver Provision of Section 29(a)

Plaintiff argues that defendant is barred from seeking rescission by the general release of claims in the Settlement Agreement.  Defendant responds that the release is void under the anti-waiver provision of Section 29(a) of the Exchange Act, because the Agreement requires future

sales of securities by an unregistered dealer, and thus involves an ongoing violation of federal securities law.

Section 29(a) of the Exchange Act states:  "Any condition, stipulation, or provision binding any person to waive compliance with any provision of [the Exchange Act] or of any rule or regulation thereunder . . . shall be void."  15 U.S.C. § 78cc(a).  "This antiwaiver provision generally invalidates blanket releases of liability that accompany the purchase or sale of securities."  *Pasternack v. Shrader*, 863 F.3d 162, 171 (2d Cir. 2017).  *But see NovaFund Advisors, LLC v. Capitala Grp., LLC*, 2020 WL 230089, at *4-5, *13-14 (D. Conn. Jan. 14, 2020) (release contained in contract did not bar plaintiff's counterclaim for rescission under 29(b) and 15(a)).

Nonetheless, not all waivers are prohibited.  When signed as part of a settlement of an existing controversy, waivers of known and unknown securities claims have been upheld if the settlement agreement was unambiguous and the result of negotiations between parties of equal bargaining power.  *See Petro-Ventures, Inc. v. Takessian*, 967 F.2d 1337, 1342-43 (9th Cir. 1992); *Locafrance U.S. Corp. v. Intermodal Sys. Leasing, Inc.*, 558 F.2d 1113, 1115 (2d Cir. 1977).

Thus, in *Facebook, Inc. v. Pacific Northwest Software, Inc.*, the Ninth Circuit upheld a mutual release within a settlement agreement, despite plaintiff's claim that Facebook had fraudulently misrepresented its valuation during the settlement negotiations in violation of an anti-fraud provision of the Exchange Act.  640 F.3d 1034, 1040 (9th Cir. 2011).  The court declined to rescind the agreement under Section 29(b), concluding that "[a]n agreement meant to end a dispute between sophisticated parties cannot reasonably be interpreted as leaving open the door to litigation about the settlement negotiation process."  *Id.*  According to the court, giving

11

final effect to such an agreement was warranted because adversaries involved in litigation "have every reason to be skeptical of each other's claims," and "can use discovery to ferret out a great deal of information before commencing settlement negotiations." *Id.* at 1039.  Similarly, in *Petro-Ventures v. Takessian*, the parties entered into a settlement agreement containing a waiver of all known or unknown claims relating to the sale and conveyance of oil and gas properties. 967 F.2d at 1337, 1338 (9th Cir. 1992).  The court upheld the agreement even after plaintiff discovered potential securities violations relating to the registration status of certain partnership units acquired in the agreement.  *Id.* at 1342-43.  In both cases, the court gave effect to the parties' unambiguous intent to end the litigation, despite the possibility that violations of securities laws may have distorted the value of the settlements.

By contrast, in *Pearlstein v. Scudder & German*, the Second Circuit held that a waiver contained within a settlement agreement was void where the settlement perpetuated a securities violation.  429 F.2d 1136, 1143 (2d. Cir. 1970).[2]  There, a defendant-lender sued the plaintiff-borrower for defaulting on its loan obligations, and the parties entered into a settlement agreement whereby the lender agreed to extend additional credit in exchange for the borrower's agreement to payment.  *Id.* at 1138-39.  After the borrower again failed to pay, the lender obtained a judgment against him.  When the borrower then sued the lender for fraud and other securities violations, the district court held that he was bound by the waiver contained within the settlement agreement.  *Id.* at 1139-43.  The Second Circuit reversed, holding that the agreement was invalid under Sections 29(a) and (b) because it authorized a continuing violation of the rule against extension of credit.  *Id.* at 1142.  *See also Newman v. Pershing & Co.*, 412 F. Supp. 463,

---

[2] The Second Circuit later abandoned *Pearlstein*'s holding that a private cause of action existed under Section 7 of the Exchange Act, 15 U.S.C. § 78g, for violations of Regulation U.  *Bennett v. U.S. Trust Co. of New York*, 770 F.2d 308, 312 (2d Cir. 1985).  *Bennett* did not address the Section 29 waiver issue.

469 (S.D.N.Y. 1975) (describing *Pearlstein* as a case where "the settlement by its very terms authorized a continuing violation of federal law").  The court also concluded that the settlement had been procured from the plaintiff "under financial pressures directly resulting from [the] defendant's [earlier] violation," and "would not secure some desirable end such as arbitration . . . ."  *Pearlstein*, 429 F.2d at 1143.

###   c.   <u>Analysis</u>

Here, there are ample reasons to uphold the Settlement Agreement, including its general release.  There is no evidence of any unfair imbalance between the parties in bargaining power.  Both parties appear to be reasonably sophisticated entities who were represented by experienced counsel at the time the Settlement Agreement was negotiated and executed.  There is no evidence that any critical facts were deliberately concealed or misrepresented at the time of the settlement.  The release was "intended to be [] broadly construed," covering "any dispute, action or claim that is known or unknown" concerning the SPAs, the notes, and the business relationship between plaintiff and defendant.  (Settlement Agreement, Ex. C).  There is no evidence of threats or undue coercion.  And the parties intended for it to provide finality to their dispute; indeed, that finality was part of the consideration offered in exchange for the settlement value.  (*See* Settlement Agreement ¶ 1.2 (stating that the settlement value was offered "[i]n consideration for the release" contained within the Agreement)).  *See Facebook, Inc.*, 640 F.3d at 1039 ("There are [] very important policies that favor giving effect to agreements that put an end to the expensive and disruptive process of litigation.").

Furthermore, the Settlement Agreement was intended to resolve a lawsuit in which there were (and apparently still are) multiple disputed issues of fact and law.  Among those disputes is the question of whether the Settlement Agreement calls for an unregistered dealer to engage in multiple securities transactions in violation of Section 15(a).  The answer to that question is

13

certainly not obvious.  Indeed, defendant's theory depends on the resolution of a variety of complicated factual questions and unsettled legal issues.  Without resolving any of those issues, the Court will review some of the key questions in order to illustrate the complexity and uncertainty of the issues involved.

**(1)**    <u>**"Engaged in the Business of Buying and Selling**</u>
<u>**Securities"**</u>

Among other things, to prove that plaintiff was an unregistered broker-dealer, defendant would have to show that plaintiff was "engaged in the business of buying and selling securities," and was not subject to the "trader exception."[3]

A dealer is "any person engaged in the business of buying and selling securities . . . for such person's own account through a broker or otherwise."  15 U.S.C. § 78c(a)(5)(A).   Under what is known as the "trader exception," that definition excludes any person who buys or sells securities "not as a part of a regular business."  15 U.S.C. § 78c(a)(5)(B); *S.E.C. v. River North Equity LLC*, 415 F. Supp. 3d 853, 858 (N.D. Ill. 2019).

Whether a party is "in the business of buying and selling securities" depends on a variety of factual questions.  "[T]he centerpiece to this definition is the word 'business,' which is defined as '[a] commercial enterprise carried on for profit, a particular occupation or employment habitually engaged in for livelihood or gain.'"  *S.E.C. v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 809 (11th Cir. 2015) (quoting BLACK'S LAW DICTIONARY 239 (10th ed. 2009)) (emphasis omitted) (concluding that defendants acted as dealers where their "*entire* business model was predicated on the purchase and sale of securities").  "Cases and S.E.C. No–Action letters interpreting the phrase have indicated that regularity of participation is the primary

---

[3] The parties do not dispute that plaintiff has not registered as a dealer.

indicia of being 'engaged in the business.'" *S.E.C. v. Kenton Cap., Ltd.*, 69 F. Supp. 2d 1, 12 (D.D.C. 1998) (collecting cases).

In reviewing S.E.C. enforcement actions involving the purchase of convertible securities, courts have identified several factors as relevant to identifying whether a party acted as a dealer.

First, courts have considered solicitation and advertisement to potential customers. *See S.E.C. v. Keener*, 580 F. Supp. 3d 1272, 1287 (S.D. Fla. 2022) (defendant solicited potential sellers and advertised interest in purchasing convertible notes online and in press releases); *S.E.C. v. Almagarby*, 479 F. Supp. 3d 1266, 1272 (S.D. Fla. 2020) (defendants "employ[ed] and pa[id] 'finders' who were in the business of soliciting referral companies for Defendants' pecuniary benefit"); *River North*, 415 F. Supp. 3d at 858 (defendant "held itself out publicly through its website as willing to buy securities").

Second, courts have considered whether a party purchases stocks directly from issuers or from the marketplace, and whether it profits from an increase in share value or by quickly re-selling stock acquired at a discount. *See Keener*, 580 F. Supp. 3d at 1288 ("Defendant acquired newly issued stock directly from microcap issuers at a discount . . . and then resold the stock into the public market"); *River North*, 415 F. Supp. 3d at 859 (finding "it particularly significant that . . . like an underwriter, [defendant]: (1) purchased stocks at a discounted price directly from numerous issuers . . .  (instead of purchasing stocks already in the marketplace, like a trader); and (2) turned a profit not from selling only after market prices increased (like a trader), but rather from quickly reselling at a marked-up price"); *Almagarby*, 479 F. Supp. 3d at 1272 (defendant's "entire business model" was to purchase securities from issuers at deep discounts and to quickly sell them back onto the market for a profit).

Third, courts have considered the volume of sales.  *See Keener*, 580 F. Supp. 3d at 1286 (defendant acted as a dealer when he converted more than 100 convertible notes from more than 100 microcap issuers, liquidated billions of shares, and generated around $10 million in net proceeds); *Almagarby*, 479 F. Supp. 3d at 1272 ("[T]he sheer volume of the number of deals and the large sums of profit [d]efendants generated—no fewer than 962 sales of shares and more than $2.8 million in proceeds—gives credence to the proposition that [d]efendants were engaged in the 'business' of buying and selling securities."); *River North*, 415 F. Supp. 3d at 858 (defendant was dealer where he "bought and sold over 10 billion shares of stock from more than 62 microcap issuers, and then quickly resold them to the investing public, receiving some $31 million in profit").

According to defendant, plaintiff meets the criteria of a dealer because it has engaged in a large volume of securities transactions, acquires stocks at a discounted price directly from issuers rather than on the open market, and lacks investment intent.  According to plaintiff, it does not invest solely to "flip" securities, but instead conducts due diligence for potential investment gain.  And it neither employs finders to identify investment opportunities, nor holds itself out to the public as willing to buy convertible notes.[4]

The Court takes no view as to which position is correct.  But it is likely that the resolution of those issues would require extensive discovery, motion practice, and other litigation, including, potentially, a trial.  That, in turn, provides ample reason why sophisticated parties might elect to enter into a settlement agreement rather than subject themselves to further litigation risk, expense, and disruption.

---

[4] Plaintiff also notes that it has no prior regulatory judgments against it and is not currently the subject of an S.E.C. enforcement proceeding.

### (2) **Transactions in Securities**

Even if plaintiff is an unregistered dealer, defendant must still show that the Settlement Agreement requires ongoing or future transactions in securities. Courts have articulated different standards for determining whether the relationship between a contract and an alleged securities violation is direct enough to warrant rescission.

Some courts limit Section 29(b) to only those contracts that "by their terms violate the Act . . . ." *Drasner v. Thomson McKinnon Sec., Inc.*, 433 F. Supp. 485, 501-02 (S.D.N.Y. 1977). Under that approach, Section 29(b) does not apply to contracts that could have been performed without violating the securities laws, but were in fact carried out illegally. *See Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 206 (3d Cir. 2006) (declining to rescind contract where "downstream sales" allegedly carried out in violation of Section 5 of the Securities Act "were tangential to the parties' basic obligations under the Agreement"); *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 202 (3d Cir. 2001) (same where alleged short sales were "too attenuated from the parties' valid, lawful contracts"); *Slomiak v. Bear Stearns & Co.*, 597 F. Supp. 676, 682-83 (S.D.N.Y. 1984) (holding that bank's failure to make required disclosures upon opening of account did "not justify rescission of the account agreement itself or transactions undertaken pursuant to that agreement," because the alleged violations were "clearly collateral" to the contract).

Two recent cases decided by the Southern District of New York employing that standard dealt with promissory notes and debt-conversion agreements that are somewhat similar to those at issue here. *LG Capital Funding, LLC v. ExeLED Holdings, Inc.* and *EMA Financial, LLC v. Vystar Corp.* dealt with SPAs and convertible notes that permitted the lender to convert outstanding debt into shares of the borrower's stock at a discounted rate. 2018 WL 6547160, at

*1 (S.D.N.Y. Sept. 28, 2018); 336 F.R.D. 75, 78 (S.D.N.Y. 2020).  In both cases, the borrower

failed to fulfill the lender's conversion requests and then affirmatively defended against the

lender's contract suit by alleging the contracts were void due to the lender's failure to register as

a dealer.  And in both cases, the court declined to find the contracts void because the terms of the

agreements did not *require* the lender to sell any shares.  *LG Capital Fund.*, WL 6547160, at *5

("neither the Note nor the SPA require [the plaintiff] to take any action that would violate [the

registration requirement]" and "the Contracts were still capable of performance even if [plaintiff]

failed to register as a dealer");[5] *EMA Fin.*, 336 F.R.D. at 82 (defendant had "not identif[ied] a

provision in the contracts that obligat[ed plaintiff] to act as a broker-dealer").  While selling the

converted shares may have been illegal, the courts concluded that this downstream conduct was

"tangential" to the contract itself; defendant could "rescind the contracts only if they were illegal

at the time they were made, not because [plaintiff] later engaged in an illegal transaction." *EMA*

*Fin.*, 336 F.R.D. at 81.

Other courts have adopted a broader approach, interpreting Section 29(b) "to render

voidable those contracts that are either illegal when made or as in fact performed." *Regional*

*Properties, Inc. v. Financial & Real Estate Consulting Co.*, 678 F.2d 552, 560 (5th Cir. 1982)

(defendant made out *prima facie* case for rescission of plaintiff-real estate entrepreneurs'

agreement with their broker under Section 29(b) due to the broker's failure to register under

Section 15(a)).  This extends to contracts that are "perfectly lawful on their face" and which

---

[5] The court declined to reach the dealer registration question, but indicated that the plaintiff "may face substantial exposure in a suit by the S.E.C. if it should have registered but did not." *LG Cap. Fund.*, 2018 WL 6547160 at *5 ("[The defendant] cannot use the threat of a hypothetical S.E.C. action to vitiate contracts that were lawful at the time they were executed.").

"under different circumstances, could have been performed without violating the Act." *Id.* at 561.[6]

The First Circuit adopted that approach in *Edgepoint Capital Holdings, LLC v. Apothecare Pharmacy, LLC*, 6 F.4th 50 (1st Cir. 2021). There, the court held that the defendant-pharmacy's contract with an investment-banking firm it had hired to assist in the sale of its business was voidable, concluding that the contract involved the attempted sale of a security (the pharmacy's equity) by an unregistered broker (the investment firm). *Id.* at 59. Following *Regional Properties*, the First Circuit rejected the argument that the contract was not "made" in violation of the Exchange Act simply because it was hypothetically possible for the investment firm to perform the contract as an asset sale, which would not have involved the sale of securities. *Id.* at 60-61. According to the court, reading Section 29(a) to apply only when contracts *necessarily* require a securities violation would frustrate the text and purpose of the Exchange Act. *Id.* at 62. Instead, it concluded that "a contract may be voidable under Section 29(b) if its performance *in fact* involved a violation of the Exchange Act." *Id.* at 59 (emphasis added) (citing *Regional Props. Inc.*, 678 F.2d at 560-61).

Again, the Court makes no finding as to whether the terms or the performance of the Settlement Agreement involve a prohibited transaction. That would require resolving, as defendant contends, whether the execution of the Agreement, because it granted plaintiff a right to convert the notes into stock, was itself a transaction in securities that violated the Exchange Act. And even if the terms of the settlement do not require a violation of the Exchange Act, but

---

[6] Some courts have read *Regional Properties* as consistent with cases where rescission is not granted because "[t]he parties could—and did—perform the contracts at issue in [those cases] without committing any violations of the Exchange Act, but the broker in *Regional Properties* could not carry out his obligations under the agreements without violating the Exchange Act." *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 201 (3d Cir. 2001). In *Regional Properties*, the broker had agreed to structure and market interests in limited partnerships on behalf of the entrepreneurs, transactions that the trial court concluded required registration with the S.E.C. *Regional Props. Inc.*, 678 F.2d at 557.

its "performance in fact" does, *Edgepoint*, 6 F.4th at 59, the Court would have to determine whether the alleged violations here are "collateral or tangential to the contract," rather than "inseparable from [its] performance." *Id.* at 61 (quoting *Berckeley*, 455 F.3d at 205). Again, for present purposes, it is unnecessary to resolve the dispute. It is sufficient to note that the issues do not have clear answers and are dependent on the resolution of factual and legal questions.

*       *       *

It is of course possible that defendant might be able both to prove the requisite factual predicates and to prevail on its legal theories. But that is very far from a certainty. The Court is reluctant, to say the least, to undo a settlement on the ground that it is possible, under some as-yet-unresolved factual and legal scenarios, that it might potentially involve a violation of the securities laws. Section 29(a) does not prohibit the settlement of any dispute involving a claim that a party violated the securities laws, nor does it prohibit all settlements that may involve the conversion or transfer of securities, no matter how unsettled the factual or legal issues. That is neither a rational result nor one commanded by the statutory text.

In short, the Settlement Agreement was an arm's-length transaction between sophisticated parties that does not run afoul of the anti-waiver provision of Section 29(a). Accordingly, the general release contained within the Settlement Agreement bars defendant from seeking recission under Section 29(b) for violations of Section 15(a).

## III.   <u>Conclusion</u>

For the foregoing reasons,

1.      plaintiff's motion to strike defendant's motion to set aside the Settlement Agreement and for further sanctions and attorney's fees is DENIED, and

2.      defendant's motion to set aside the Settlement Agreement is DENIED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Dated: February 21, 2023                Chief Judge, United States District Court